UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VICKI MURPH-JACKSON | ) | |
| | ) | No. 07 C 6005 |
| v. | ) | |
| | ) | Hon. Charles P. Kocoras |
| UNITED STATES OF AMERICA | ) | |

## GOVERNMENT'S RESPONSE TO § 2255 MOTION

Pursuant to 28 U.S.C. § 2255, Vicki Murph-Jackson has moved to set aside her sentence for narcotics related offenses on the ground that she received ineffective assistance of counsel. Her motion should be denied.

## **Background**

Murph-Jackson was charged by way of indictment in 2002 with a variety of narcotics offenses growing out of her role in the Kevin Turner drug organization that operated for years on the south side of Chicago. R.1. Count One charged nine defendants, including Murph-Jackson, with conspiracy to possess with the intent to distribute and to distribute in excess of five kilograms of cocaine in violation of Title 21, United States Code, Section 846. R. 1 at 1-4. Count Two charged Kevin Turner, Rodney McLee and Murph-Jackson with possession of cocaine and cocaine base with intent to distribute (21 U.S.C. § 841(a)(1)). R. 1 at 5. Count Three charged McLee and Murph-Jackson with possession of a firearm in furtherance of a drug trafficking crime (18 U.S.C. §

924(c)). R. 1 at 6. Counts Six through Eleven consisted of telephone counts against various defendants (21 U.S.C. 843(b)). R. 1 at 9-14.

Murph-Jackson went to trial with Rodney McLee and Wanda Turner; the jury convicted them. Murph-Jackson was convicted of Count One, Count Two, and Count Ten, and acquitted of Count Three. R. 180, 182, 184, 187. The jury returned *Apprendi* special verdicts of less than 500 grams of cocaine against Wanda Turner but more than 5 kilos of cocaine against Rodney McLee and Vicki Murph-Jackson. R. 181. Attorney William Laws represented Murph-Jackson in the district court and in the ensuing appeal.

### The Government's Trial Evidence

The government's evidence at trial established the existence of a years' long—from 1996 to 2002—cocaine conspiracy that operated on the south side of Chicago. The defendants each took a role in that conspiracy, which was headed by Kevin Turner. The evidence establishing this conspiracy consisted of witness testimony from cooperating defendants, law enforcement officer testimony to the results of surveillances and searches, and wiretap evidence gathered from two court-authorized interceptions of telephones used by Kevin Turner.

The evidence that proved the existence of this conspiracy was overwhelming. Most prominently, there was a Title III wiretap on two of Kevin Turner's phones for two thirty-day periods from December 2001 to February

2

2002. During the wiretaps, well over 1000 calls were intercepted between Kevin Turner ("Turner") and various individuals, including many pertinent calls with his co-conspirators discussing all aspects of the drug-trafficking operation and other aspects of the conspiracy.

The evidence showed that Turner bought cocaine powder in kilogram and, later, multiple kilogram quantities from Juan Martinez and others. Turner sold the cocaine in wholesale quantities to other co-conspirators, usually as powder cocaine, and used his codefendants for storing and delivering cocaine as well as for brokering cocaine deals. In particular, Rodney McLee and his wife, Murph-Jackson, stored Turner's cocaine for him at their residence in Calumet City, Illinois; Rodney McLee and others acted as runners or delivery persons for Turner's drug operation, dropping off drugs and picking up money at Turner's direction. Rodney McLee and Murph-Jackson stored and protected Turner's cocaine for him. Rodney McLee and others acted as brokers for the Turner drug operation, that is, they brought customers who wanted to purchase cocaine into contact with Turner who had cocaine to sell. In addition, Murph-Jackson and Rodney McLee, kept track of Turner's drug proceeds, collecting, counting, storing and disbursing Turner's drug money at his direction.

From December 29, 2001 through January 21, 2002, the DEA and local law enforcement officers intercepted conversations concerning the conspiracy on

3

a cellular phone used by Kevin Turner ("Target Phone 1") pursuant to a Court-authorized wiretap. On January 31, 2002, another Court-authorized wiretap began on a second phone used by Turner ("Target Phone 2"); this interception ceased on February 26, 2002. Conversations concerning the conspiracy were intercepted on both Target Phones 1 and 2.

*The February 21, 2002 Seizures*

On February 21, 2002, several events transpired that were featured in the government's evidence at trial. On the Turner wire that day, conversations were intercepted indicating that Kevin Turner was preparing to make a large payment to Juan Martinez for drugs that Turner had received from Martinez. Turner was intercepted instructing McLee and Murph-Jackson to gather the money together to pay Martinez, and was further intercepted arranging the payment with Martinez. Law enforcement officers working with the DEA were able to watch McLee and Murph-Jackson as they met with Martinez at a liquor store at 87th and South Chicago on the south side. Martinez (in one car) and McLee and Murph Jackson (in another car) were then followed to the vicinity of 88th and Yates where McLee was observed to hand a plastic bag to Martinez. Martinez was followed away from the meeting and stopped. The bag contained approximately $47,000 in currency. Following this seizure, Martinez was

4

intercepted telling Turner not to use his phone, and the investigation became overt.

Following that call, that same evening officers went to 402 Hirsch in Calumet City, the residence of Murph-Jackson. After obtaining her consent to search, the officers recovered approximately 40 kilos of powder cocaine, 400 grams of cocaine base, and one loaded 9mm handgun. Other items of evidentiary value were also recovered from Murph-Jackson's bedroom, including notebooks which contained entries corresponding to figures discussed by Turner and Murph-Jackson over the wire intercepts.

*Defendant Testimony*

The government called as witnesses at trial codefendants Kevin Turner, Prince Turner, Jr., and Steve Brown, as well as two defendants from other case, Jones and Everett. The testimony from these witnesses covered all aspects of the conspiracy, from the suppliers down to Turner's customers, and each of them implicated Murph-Jackson in the conspiracy as a highly placed and trusted confidant and coconspirator of Kevin Turner.

*Wire Intercept Evidence*

The most damning evidence against Murph-Jackson, however, consisted of her own conversations that were secretly recorded on government wiretaps. The government offered more than 60 tape recordings from court-authorized

wire interceptions into evidence, including recordings on which Murph-Jackson was intercepted discussing drug operations with Kevin Turner. For example, the recordings confirmed that Vicki Murph-Jackson stored cocaine (also confirmed by the search of her house in February 2002) and dispensed it from her house at Kevin Turner's direction. On February 7, 2002, call # 154, Kevin Turner told Vicki that "G-Ball" wanted to see "the M" (a code word for a kilo of cocaine.) Turner told Vicki that G-Ball was going to exchange some drugs for two kilos of cocaine, and that Vicki had to hurry ("but you got to hurry cause he got to um, two of the um the M's and plus fifty out of another one. Right and then he gonna give you, you'll see what he got. He give it to ya back," #154). On February 2, 2002, Call # 23, Vicki also reported to Kevin Turner--who asked "did Al shoot through there yesterday?"--that he did and that he owed Kevin Turner "eight dollars" or $8000. On February 8, 2002, call # 165, Vicki told Turner that she didn't "have any yellow ribbons I just have black ribbons," referring to kilos of cocaine.

Vicki also collected money for Kevin Turner, as evidenced by numerous calls, including # 14 on February 1, 2002 ("TURNER: Did Prince give you that yesterday? VICKI: Yeah, fifteen.") In a series of calls beginning with call # 171 on February 8, 2002, Kevin Turner, Rodney McLee and Vicki all discuss the fact that "G-Ball" had purchased a kilo of cocaine for $21,000, but that initially Vicki

counted only $12,000 in payment. When Turner asked why McLee had taken a whole kilo to G-Ball, McLee said, "That's what you told me to take to him." In call #172 later that same day, Turner speaks directly with Vicki and directs her to count the money again--"you got to count it, count it, count it all the way through." In the next call, call # 173, Turner confirms with McLee what McLee had given his wife--"that's what I gave her, I gave her three stacks . . . TURNER: She said you gave her god damnit two stacks dude what I'm trying to say. McLEE: I gave her three, Waldo, god damnit bye bye." In calls #174 and #175, Vicki reports to Turner that the money was there, all $21,000--call # 175, "Yeah, I got twenty-one dollars." And Turner states, call #174, that "dude"--presumably G-Ball--"is going ballistic, he don't even want to fuck with Waldo no more, he going ballistic."

In calls # 123, 124 and 125 on February 6, 2002, Turner, Brown and Vicki were intercepted in conversations evidencing their involvement with Turner's drug business, including drug deliveries that Brown was to make for Turner.

Rodney McLee delivered drugs, picked up money, and acted generally as Kevin Turner's right hand man. In one call, # 55 on February 3, 2002, Kevin Turner was intercepted instructing McLee to pick up all the money--"the paperwork"--including the "paperwork" from Prince Turner, Jr. before meeting with Turner. McLee is also intercepted reporting back to Turner on the count

of money that he had collected that day, call # 77. In that call, McLee told Turner that Vicki had counted the money and that it was short--"she just counted this money and this money is not all here. It's ten six and it's twenty-seven fifty. Now I ain't touched shit." In this call, Turner instructed McLee to call Prince, who was suspected as the source of the shortage. McLee also was intercepted discussing the price charged by Turner for the drugs (for example, call #152: "MCLEE: She only wanted to go over there to 28th Street twice, you know what I'm saying?").

## The Sentencing

On February 24, 2004, Murph-Jackson was sentenced to 262 months' imprisonment. 2/24/04 Tr. 18. The Court arrived at the sentence as a product of an offense level 38 and criminal history category II; the Court imposed a sentence of the low end of the guidelines range.

Murph-Jackson appealed her conviction, with Laws again representing her. Although unsuccessful on the merits, Murph-Jackson's case was remanded to this Court for a *Paladino* determination: whether the Court would have imposed the same sentence on Murph-Jackson under a regime of advisory guidelines as it did under the mandatory guidelines. *United States v. McLee*, 436 F.3d 751, 766-67 (7th Cir. 2006). The Court replied that it would impose the

same sentence under the advisory guidelines, R. 283, and the Seventh Circuit affirmed. *United States v. Murph-Jackson*, 187 Fed. Appx. 653 (7th Cir. 2006).

## The § 2255 Motion

Murph-Jackson has timely filed a § 2255 motion attacking her conviction and sentence on the ground that she received constitutionally ineffective assistance of counsel.[1] Murph-Jackson alleges that her attorney was ineffective for:

having failed to object to an improper criminal history assessment, Motion at 3;

having failed to obtain a safety-valve reduction, Motion at 8;

having failed to explain the Sentencing Guidelines to defendant, Motion at 10;

having failing to conduct a sentencing investigation or request a downward departure for extraordinary family circumstances, Motion at 10;

having failed to appeal the improper criminal history assessment, Motion at 15;

having failed to seek a lower sentence at the *Paladino* remand stage of the case, Motion at 20;

having failed to properly prepare for trial and to perform adequately at trial, Motion at 29.

---

[1] Because Murph-Jackson was represented on appeal by Laws, who represented her in the district court, her default in failing to raise these claims on direct appeal may be excused. *See United States v. Rezin*, 322 F.3d 443, 445 (7th Cir. 2003).

To prevail upon her claims of ineffective assistance in this §2255 petition, Murph-Jackson must demonstrate that her counsel made "errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Franklin v. Gilmore*, 188 F.3d 877, 883-84 (7th Cir. 1999); *United States v. Hall*, 212 F.3d 1016, 1021 (7th Cir. 2000) ("Because counsel is presumed effective, a party bears a heavy burden in making out a winning claim based on ineffective assistance of counsel").

A defendant must show that "his counsel's service did not meet an objective standard of reasonableness and that there is a fair probability that but for his attorney's ineffectiveness, the result of the trial would have been different." *United States v. Meyer*, 234 F.3d 319, 324-25 (7th Cir. 2000); *Strickland*, 466 U.S. at 689. The Seventh Circuit has explained that this dual showing is difficult to make:

> Our review of a trial attorney's performance is "highly deferential." Our analysis begins with the "strong presumption" that the defendant's attorney rendered adequate representation of his client. Moreover, as the Supreme Court has emphasized, the range of attorney performance that will satisfy the Sixth Amendment's guarantee of counsel is wide.

*Meyer*, 234 F.3d at 324-25 (citations omitted).

To satisfy the first requirement, reasonable performance, the defendant must identify the specific acts or omissions of counsel that form the basis of the

10

ineffective assistance claim. *Strickland*, 466 U.S. at 690. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id.* The court's scrutiny of counsel's performance must be conducted with a high degree of deference and without the distorting effects of hindsight. *Id.* at 689; *United States v. Ashimi*, 932 F.2d 643, 648 (7th Cir. 1991)(it is necessary to "evaluate the conduct from counsel's perspective at the time, and indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional conduct).

As for the second requirement, prejudice, a "reasonable probability" of a different result means a "probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. In *Lockhart v. Fretwell*, 506 U.S. 364 (1993), the Supreme Court further clarified that the "prejudice" prong involves more than just "mere outcome determination." *Id.* This prong requires the defendant to show that counsel's errors were so serious as to deprive the defendant of a fundamentally fair and reliable proceeding. *Id.* A defendant must do more than speculate that the outcome of his proceeding would have changed; rather, he must show deficient performance by his counsel and prejudice to his right to a fair proceeding. *Id.* In the context of sentencing issues, a "showing that counsel's errors had 'some conceivable effect on the

11

outcome of the proceeding' is not sufficient to demonstrate prejudice." *United States v. Ruzzano*, 247 F.3d 688, 696-97 (7th Cir. 2001)(citation omitted). Although the Supreme Court's admonition that any amount of additional time in prison can constitute prejudice, a defendant must still show a reasonable probability that he received additional prison time because of counsel's error. *Id.* (citing *Glover v. United States*, 531 U.S. 198 (2001)). In deciding whether a particular error prejudiced the defendant, "a court should presume . . . that the judge . . . acted according to law." *Id.* (citing *Strickland*, 466 U.S. at 695).

Murph-Jackson's claims of ineffective assistance are all meritless. We deal with them in turn.

1. *Failure to Object to Criminal History Category.*

The probation office's presentence investigation report on Murph-Jackson assessed her three criminal history points: one point for a conviction dating to May 24, 1995, for public assistance fraud and theft, and two points for having engaged in the offense of conviction while on probation for that conviction (Murph-Jackson had received a sentence of three years' probation). At sentencing,[2] Laws objected to any implication in the PSR that Murph-Jackson

_____

[2] The sentencing transcript for Murph-Jackson is attached as Exhibit 13 to her motion. We cite it as "2/24/04 Tr." The sentencing transcript for Rodney McLee is attached as Exhibit 14 to Murph-Jackson's motion. We cite it as "2/24/04 Tr. ___ (McLee sentencing))."

12

had been involved in the conspiracy from its inception in 1996, 2/24/04 Tr. at 5, and the government agreed that she had not participated in the conspiracy from the beginning. *Id.* Nevertheless, the Court assessed her the two additional points. *Id.* at 12.

Now Murph-Jackson faults her attorney's performance on this score, alleging that it was clear at the time of sentencing that her involvement in the conspiracy could not have predated the end of her term of probation in the spring of 1998. Motion at 4-5. In fact the evidence at trial supported an inference that Murph-Jackson's involvement in the conspiracy predated the expiration of her period of probation.

Murph-Jackson's involvement in the offense of conviction dated back at least to the summer of 1998, some six months before the end of that year. On direct examination, Kevin Turner testified that in 1998 Murph-Jackson and McLee stored drugs for him at their house on Burnham in Chicago. Tr. 236-37, 244.[3] Turner testified that he paid Murph-Jackson for her help in his drug business beginning in 1998. Tr. 254. According to Turner, he had paid Murph-Jackson about $300 per week for some six months before the end of 1998, when she took on added responsibilities because McLee was no longer trusted. Tr. 255, 259. Prince Turner testified that he became aware of Murph-Jackson's role

---

[3] The trial transcript pages cited here are attached as Exhibit 1.

in the drug organization in 1998.  Tr. 634.  Vernon Everett testified that he met Murph-Jackson in the summer of 1998 when she accompanied McLee on several drug deals in which Everett participated.  Tr. 543-44.

But the government also introduced evidence at trial that placed Murph-Jackson's involvement in the offense even earlier.  On direct examination, Steve Brown testified that he knew Murph-Jackson and McLee were storing drugs at their home on Burnham at least as far back as 1996.  Tr. 684-85.  According to Brown, when he went to pick up cocaine from their house, either McLee or Murph-Jackson would let him in.  Tr. 686.  Either McLee or Murph-Jackson would give Brown the cocaine.  Tr. 687.  On occasion, Brown observed Murph-Jackson to be present in the home when Turner, McLee and Brown packaged cocaine at Murph-Jackson's house.  Tr. 687.  On cross-examination, Brown testified that in 1996 he never saw Turner give Murph-Jackson money, but that he did observe her to be present in the same room when drugs were being packaged.  Tr. 719-20.

The factual record therefore provided support for the determination that Murph-Jackson became involved with the instant offense prior to the summer of 1998, while she was serving a term of probation.  Thus, the two-point enhancement in her criminal history was not due to deficient performance by her attorney but was rather an accurate guidelines calculation based on the evidence

14

introduced at trial. Given Laws' objection to the PSR's timing of her involvement in the conspiracy and the factual support for the Court's ultimate conclusion, Murph-Jackson has not shown that Laws' performance fell short of the "objective standard of reasonableness," the first step of the *Strickland* analysis.

At any rate, whether or not Laws' performance improperly resulted in an additional two criminal history points, Murph-Jackson cannot demonstrate that she was prejudiced by Laws' actions: the sentence she received, 262 months, is in the lower half of the guidelines range that she contends she would have been in had her attorney not blundered—235 to 293 months. Motion at 7. And given that the Court affirmed its sentence on the *Paladino* remand as what it would have given under a regime of advisory guidelines, Murph-Jackson can only speculate that the Court would have gone lower than 262 months under a lower guidelines range. But speculation does not suffice to show prejudice under *Strickland*.

2.    *Failure to Obtain Safety Valve Reduction.*

As for the claim that Laws failed to obtain the safety-valve reduction, Murph-Jackson's argument hinges once again on the proposition that her attorney improperly failed to challenge her criminal history category. Motion at 8-9. Murph-Jackson contends that Laws had only to object to the criminal

15

history category in order for her to qualify for a reduction in sentence under Guideline § 5C1.2.  Motion at 9.  But this is altogether too simplistic:  we have seen how Laws did in fact object to the implication in the PSR that Murph-Jackson had been involved in the conspiracy from its inception in 1996, 2/24/04 Tr. at 5, and thus by extension the assessment of two additional criminal history points.  Laws cannot have been ineffective merely because his objection failed to carry the day.

More importantly, however, Laws had already before the time of sentencing twice proferred Murph-Jackson in an attempt to secure a plea agreement for her, and she had not been completely truthful about her involvement in the offense she was charged with.  Notably, in each proffer, Murph-Jackson had denied knowing about the kilograms of cocaine found in her attic.  At sentencing, Murph-Jackson continued to deny knowing about the kilos of cocaine in her attic, and the Court found her not to be credible:

> Vicki, if you are trying to tell me that you did not know those drugs were there, I do not believe you--if that is what the point of that is. You knew those drugs were there.  You did not do anything to get rid of them. . . . But insofar as the cold, hard fact is concerned, there is no doubt in my mind that you knew those drugs were there.  And they were part of this conspiracy.  And you need to face up to that.

2/24/04 Tr. 15.

Given that Murph-Jackson had twice failed to tell the truth about her involvement in the conspiracy prior to trial and that she insisted on an

16

untruthful version of her involvement right up to the day she was sentenced, Laws cannot be faulted for having failed to obtain a safety-valve reduction for her. Murph-Jackson's untruthfulness, quite apart from her criminal history category, disqualified her from the safety-valve reduction. Laws could well have been concerned that to insist on pushing forward with an untruthful version of her involvement at a contested hearing on the safety valve would have earned his client an even harsher sentence for having committed perjury or obstruction. This is hardly the type of deficient attorney performance that would merit relief on the ground of ineffective assistance.

### 3. Failure to Explain the Sentencing Guidelines

Murph-Jackson next contends that Laws rendered ineffective assistance because he failed adequately to explain the Sentencing Guidelines to her and failed to go over the PSR with her. Motion at 10. At sentencing, however, Murph-Jackson stated that she had reviewed the PSR, 2/24/04 Tr. 3, and that she had discussed it with Laws. 2/24/04 Tr. 4.

Laws proceeded to register objections to the PSR on Murph-Jackson's behalf, most importantly with regard to the firearm enhancement that the government was seeking at sentencing. 2/24/04 Tr. 4-8. Laws' objection to the firearm enhancement was successful: the Court declined to assess Murph-Jackson the additional two points. 2/24/04 Tr. 12.

Thus Laws demonstrated an understanding of the Sentencing Guidelines and how they worked. He was the lawyer, not Murph-Jackson, and if she did not fully understand the complexities of the Guidelines calculations, it was not necessarily due to inadequate performance on his behalf. To be sure, Murph-Jackson protested that she failed to understand how her offense level could come to 38, 2/24/04 Tr. 16, but that could well have been more a product of her unwillingness to come to grips with the realities of her situation than a product of her lawyer's deficient performance.

But beyond all this, Murph-Jackson has failed to explain in what manner she was prejudiced by Laws' supposed failure to explain the Guidelines. Because she has not done so, she cannot satisfy the second part of the *Strickland* test with this claim.

> 4.   *Failing to Conduct a Sentencing Investigation or Request A Downward Departure for Extraordinary Family Circumstances.*

Murph-Jackson next claims that Laws was ineffective for having failed to conduct a sentencing investigation or to move for a downward departure for extraordinary family circumstances. Motion at 10-13. While she contends that Laws' performance in this regard was wholly inadequate—claiming that he refused to submit letters and present evidence of her family situation to the Court, Motion at 11—Murph-Jackson does not acknowledge the fact that the Court was very aware of her family situation at the time of sentencing. Her

assumption that the Court would have granted a departure motion if it had been made is just that—an assumption, with little to back it up.

The Court was very aware of Murph-Jackson's family situation at the time of sentencing. The Court remarked that it had received a lot of letters on her behalf. 2/24/04 Tr. 2. The Court remarked that it found the letters "heart wrenching," 2/24/04 Tr. 4 (McLee sentencing), and the Court addressed itself to Murph-Jackson's family members who attended the sentencing:

> While [the letters] are all in some way or other heart wrenching, they all depart on the legal premise that I have discretion to start from scratch in fashioning a sentence, which is inaccurate as a matter of law. I have very little discretion. The guidelines apply in this case and we are all bound to those. And, so, I just tell the family members of Ms. Murph-Jackson that whatever my thoughts would be, if we had a different sentencing scheme or structure, do not really matter because I am bound to the guidelines. And there is nothing I can do to change that. So, I just want you to understand that.

2/24/04 Tr. 4 (McLee sentencing). At the end of McLee's sentencing (which preceded Murph-Jackson's on the same day), the Court also stated:

> I do not have a free hand, as I told everyone here, and especially his family, in either Rodney's case or Vicki's case. I have virtually no hand at all, if you want to know the truth. But the only thing I can say about that is that—and there is an irony here that is inescapable—there are six children that Rodney, in some way or other, had some responsibility for; much more so Vicki, but Rodney, as well. I did not get letters from all of the children, but I think almost all of them; from a lot of relatives and people who are interested, who implored me to let Vicki go because they need her.

19

> And I do not doubt the sincerity of any of that, or its truth; but, the irony I refer to is this, and in some ways it is analytical and an abstraction; and in other ways, it is real: These drugs that this conspiracy was responsible for, if you track them all the way through, you would come to the conclusion that a lot of young lives got ruined or put on a different path because of the availability of drugs . . . . And when you think about those children who were not born of the flesh of Vicki Murph-Jackson or someone she was associated with, their welfare, just as Vicki's children and Rodney's by de facto adoption—or at least some concern over their welfare—were equally affected.

2/24/04 Tr. 16-17 (McLee sentencing).

The Court thus expressed its familiarity with Murph-Jackson's family situation and with the letters written on her behalf expressing the need to have her with her family. But the Court also quite reasonably expressed its concern for those families and children who were affected by her criminal conduct. Contrary to Murph-Jackson's claim now, it is hardly clear—even in hindsight—that had Laws moved for a downward departure for extraordinary family circumstances that the Court would have granted the motion. The Court was familiar with her family circumstances, from the letters it received before sentencing and from the PSR, and the Court gave no signal that it was inclined to depart downward. Indeed, when given the chance to do so on the *Paladino* remand, the Court declined: "The Court affirms that it would have imposed the same sentences as previously imposed against defendants Rodney McLee and

20

Vicki Murph-Jackson had the Guidelines been advisory and not mandatory." R. 283.

Murph-Jackson's assumption—that had Laws made a departure motion the Court would have granted it—is therefore unwarranted. She has not shown that his performance was deficient or that she was prejudiced by it in this regard, and thus fails to meet the requirements of *Strickland*.

5.   *Failure to Appeal Improper Criminal History*

Murph-Jackson's claim that Laws provided ineffective assistance of counsel on appeal stems from the argument, discussed above, that Laws had improperly failed to secure her a lower criminal history category at sentencing. Motion at 15-18. (She also contends that he was wholly absent from the appeal, but this is incorrect: Laws preserved a number of arguments on Murph-Jackson's behalf, including ones about the admission of alleged hearsay, the necessity for the wiretaps, and the limitation on cross-examination of government witnesses. *United States v. McLee*, 436 F.3d 751, 760-65 (7th Cir. 2006)). But as we have seen, the record provided factual support for the Court's finding that Murph-Jackson was involved in the offense of conviction while on probation; one cannot say that Laws' refusal to prosecute an appeal of this finding, in the face of the deferential standard of review afforded to factual findings, was necessarily deficient.

21

In any event, as we have explained above, Murph-Jackson cannot show prejudice from Laws' conduct: the sentence imposed by the Court lies in the middle of what she contends should have been the guideline range but for her attorney's ineffective assistance, and that sentence was affirmed by the Court to be its proper choice of sentence on the *Paladino* remand. Murph-Jackson cannot show prejudice resulting from Laws' performance on appeal, and she again fails the *Strickland* test.

6. *Failure to Seek Reduced Sentence on Paladino Remand.*

Murph-Jackson's next claim alleges that Laws was ineffective for having failed to seek a lower sentence at the *Paladino* remand stage of the proceedings. Motion at 20-28. But Murph-Jackson fails to show prejudice: she has not shown that had Laws behaved in the manner she now desires, the Court would have indicated a desire to sentence her less severely. As we have discussed above, the Court was very well aware of Murph-Jackson's role in the offense, her family situation, and the severity of the sentence called for under the guidelines at the time of sentencing. No doubt the Court recalled all of this on the *Paladino* remand—without reminding from Laws—and yet it declined to issue a lower sentence. This cannot be attributed to deficient performance by Laws, but rather to the Court's own determination of what the proper sentence for Murph-Jackson should be. After all, the Court declined also to lower the sentence for

22

McLee, even though the Court heard from McLee's counsel on the *Paladino* remand. McLee's lawyer argued at length that the § 3553 factors militated for a lower sentence now that the guidelines had become advisory. Just as it had with Murph-Jackson, the Court had indicated at McLee's sentencing that the guidelines were severe, 2/24/04 Tr. 18 (McLee sentencing). Neither the Court's initial impression that the guidelines were harsh nor the filing of a sentencing submission on *Paladino* remand were sufficient to move the Court with regard to McLee; Murph-Jackson has failed to demonstrate that the Court would have been moved in her case.

7. *Ineffective Performance at Trial.*

Murph-Jackson's final claim is that Laws rendered ineffective assistance at her trial. Motion at 29-33. She wholly fails on the prejudice portion of this claim, however: the evidence was simply too overwhelming for her attorney's alleged deficient performance to have had an impact on the result of the trial. Murph-Jackson was going to be convicted no matter who represented her, as can be seen from a quick review of the government's evidence at trial, discussed above.

Murph-Jackson's current claim—that Laws was ineffective at trial because he failed to investigate and present "exculpatory" witness testimony at trial to meet the government's contention that Murph-Jackson knew that the attic of her

home contained some 40 kilograms of cocaine and an automatic pistol, Motion at 30-31—does not bear up under scrutiny. Murph-Jackson contends that the "most damaging evidence" against her was the box containing the drugs and a gun found in the attic of her house. Motion at 30. According to her, Laws should have countered this evidence with testimony from her mother and children to the effect that Murph-Jackson did not go into the attic and thus could not have known of the contraband hidden there.

Leaving aside the fact that her mother and children were not in a position to testify that Murph-Jackson *never* in fact went into the attic, they were also not in a position to testify as to whether Murph-Jackson indeed knew what was in the attic whether she went up there or not. Murph-Jackson no doubt concealed many aspects of her criminal behavior from her mother, children, neighbors and acquaintances. Her role in the Kevin Turner drug organization was necessarily a secretive one, and it was to be expected that she would conceal from non-conspirators her knowledge about the location of the conspiracy's drugs. Laws' failure to call these witnesses to testify to this supposedly "exculpatory" evidence was hardly prejudicial.

Moreover, the most damaging evidence at trial was not the cocaine found in Murph-Jackson's attic. The most damaging evidence consisted of the intercepted telephone conversations between Kevin Turner and Murph-Jackson.

24

In listening to these conversations, the jury was able to follow Murph-Jackson's participation in the charged criminal conduct in real time, as it happened, and in her own words. There was nothing more damaging than that, and Laws could have called all of Murph-Jackson's friends, relatives and children and not been able to negate the impact of that evidence that so graphically and persuasively demonstrated her guilt.

The government respectfully requests that the Court deny Murph-Jackson's § 2255 motion.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


/s/ Stuart D. Fullerton
By:  STUART D. FULLERTON
Assistant United States Attorney
219 S. Dearborn St., 5th Floor
Chicago, Illinois  60604
stuart.fullerton@usdoj.gov
(312) 353-5266

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

### GOVERNMENT'S RESPONSE TO § 2255 MOTION

was served pursuant to the district court's ECF system as to ECF filers, if any, and was also sent by first class mail on March 28, 2008, to the following:

> Alison Siegler
> Federal Defender Program
> 55 E. Monroe
> #2800
> Chicago IL  60603

s/ Stuart E. Fullerton
STUART D. FULLERTON
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois
stuart.fullerton@usdoj.gov
(312) 353-5266

26